UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )      Case No. 2:22-cr-20184
                                    )      Hon. Laurie J. Michelson
      vs.                           )
                                    )
JOHN DAVID, D-2,                    )
                                    )
              Defendant.            )
_____/

## SENTENCING MEMORANDUM

This Memorandum and the attached letters and other exhibits are respectfully offered to supplement the Presentence Investigation Report (hereafter referred to as the "PSI") by addressing the appropriate advisory guideline range, the nature of the offense and John David's history as a unique individual.

The Court's task in every sentence hearing is formidable. It should be more so here. The Court is well familiar with the statutory mandated obligation to determine a sentence which is "sufficient, but not greater than necessary." 18 USC § 3553(a)(2) (emphasis suppled).

## JOHN DAVID, THE INDIVIDUAL AND HIS BACKGROUND

The accumulated letters speak to the nature and qualities of John David.[1] John David is a prisoner of his own body, which is unrelentingly degenerating, and he lives in a chronic state of pain.  His Facioscapulohumeral Muscular Dystrophy, surgeries and health issues are set forth in a Motion for Downward Departure.  These permanent, worsening conditions have not made him bitter.  There is no self-pity, but rather a lifelong, remarkable spirit of generosity, compassion, and empathy.  The reality is captured in the many sincere letters attached hereto.  He has long demonstrated a concern for and desire to help others, including strangers.[2]

Mr. David's wife, Carleen, describes an occasion when her husband, while driving to work, heard a radio station speak of a fundraiser to help a young blind girl obtain a leader dog.  He drove to the location only to learn the money was raised.  When he spoke to the girl, she told him about her friend who also needed a dog.  So, he gave the donation to accomplish that.  (Exhibit 1)

Julie Yarema (Exhibit 2) and Michelle Webster (Exhibit 3) describe how he provided a remodeled bathroom for a woman struggling to take care of her disabled husband.  Upon learning of her difficult financial situation, he chose not to charge her.

---

[1] Many writers have known him for upwards of thirty and forty years.
[2] This is the opposite of selfish and avaricious.

Other examples abound:

> Pamela Ayres (Exhibit 4) "generous to our special needs community."

> Kristy A. Paquin (Exhibit 5) "never shies away from giving to charities, supporting the community or individuals in it." She gives specific examples:
>
>> (a) support the family of a fallen police officer; (Exhibit 5a)
>> (b) support for child cancer victims and their families.

> Very Reverend Father, Joseph Abud (Exhibit 6) "gone out of his way to help whether with his time or resources . . . even strangers."

> David Addy (Exhibit 7) "served Catholic Near East Welfare Association (CNEWA) . . to feed and educate the poorest of the poor."

> Reverend Michael Duchene (Exhibit 8) "has personally seen numerous acts of kindness to community and people (strangers in need)."

> Tracy Sekula (Exhibit 9) "helped an abused wife transition from a shelter to an apartment and providing handyman service for her parents after her father suffered a stroke."

Not surprisingly, he is caring and generous to employees.

> Joey L. Pool-Blair (Exhibit 10) "when no longer able to do physical work brought him back to do something different." Helped with his father's funeral expenses. "never met a kinder person who cares for his employees and anyone he meets."

> Robert G. Brannan (Exhibit 11) "genuinely cares for those around him" and the business has a "family culture."

And to others in the school system and Madison Heights community.

Gerald Binkley (Exhibit 12) "genuine and compassionate person," regular contributor to Middle School Science Night, helped residents to clean up basements providing dehumidifiers free of charge, uniforms for various teams and Little League Football Program.

## **FAMILY**

John David was a devoted, good, loving son.[3]  He is a good husband, father, and brother.   Letters from family members including in-laws demonstrate this reality.

Mary David Terry, sister (Exhibit 13)

Judy Simony, sister (Exhibit 14) "a pillar of support for our family."

Gerald Simony, brother-in-law (Exhibit 15) writes of the David sibling, Jim, with an incurable tumor and John and Albert David's search for a cure in Boston, Houston, and Oklahoma City.  As the ER Controller he writes separately of the impact the indictment has wrought on the business and employees (Exhibit 15a).

Mary H. Price, family friend of 29 years (Exhibit 16) "a devoted family man" "loving and dedicated husband . . . caring and responsible father . . ."

Christopher L. Terry, brother-in-law (Exhibit 17) "unrelenting devotion to his widowed mother will always stand out in my memory."

---

[3] Mr. David was indicted on July 13, 2022 and his mother, age 94, was admitted to hospice care close in time.  She passed on September 26, 2022.

## REMORSE AND SHAME

Most writers have observed John David's deep-seated remorse, a common thread throughout the body of letters.

> Thomas Salvati, an insurance agent who became a profound friend (Exhibit 18) observes that a garrulous person with "a deep sense of community spirit" has become introspective and quiet.
>
> Chorbishop John D. Faris, a priest for 47 years in touch with the David family (Exhibit 19) emphasizes John David's "genuine remorse."
>
> Paul F. Joelson (Exhibit 20) "his remorse is genuine."
>
> Daniel H. Moss (Exhibit 21) "embarrassed and ashamed."

A number of writers speak about John David's devotion to church. These remarks are corroborated by the number of different clergy or church related people, some already mentioned herein and others like Pastor Daniel C. Moore, (Exhibit 22) or Joan DeRonne, Parish Administrator, Assumption Greek Orthodox Church (Exhibit 23).

The remaining letters continue in the same vein as those mentioned previously. They discuss the same good, positive qualities.

> Carmela R. Ayoub Takach (Exhibit 24)
> Michael Furgal (Exhibit 25)
> Renee X. Schapley-Stone (Exhibit 26)
> Chelsea Bernas (Exhibit 27)
> Jim Yarema (Exhibit 28)
> David Yarema (Exhibit 29)
> Mark A. Hypnar (Exhibit 30)
> Mark N. Sprader (Exhibit 31)

Gregory Simony (Exhibit 32)
Ramsey A. Nassar (Exhibit 33)

## **THE OFFENSE**

The case is far from concretely black and white.  It is atypical for a bribery charge, an inextricable knot of payments for influence, for services of value separate from Madison schools including job referrals, both public and private, and friendship.[4]  Unlike many bribery cases there are no false or inflated invoices.  Most work was approved through insurance companies and John David brought invaluable experience and knowledge about insurance.  The government's position is evidently that if Morrison contacted anyone in the Clawson school district, obtained a contact number, gave it to David, David contacted someone in Clawson introducing the company and later actually got substantial work, then any payment to Morrison constitutes part of the bribe.  Simply put, Morrison has no control or authority whatsoever in any other school district and what he did is too attenuated. It is not part of the bribe.

It is exceedingly difficult to parse the value of what Morrison did outside the district from the continued work he helped procure in the school district.  The consulting company was not formed until later and payments only began after, in

---

[4] With regard to "friendship," loans and extravagant gifts, *cf. McDonnell v. United States*, 136 S.Ct. 2355 (2016), not to mention the spate of news articles touching upon the legislative and judicial branches of government.

May 2014.  The task is further complicated by the fact ER was already working in the district (Edison School Feb 2014) before John David and Al Morrison rekindled a long dormant past relationship.  The task of determining an amount attributable to bribery is perhaps not unlike the task of estimating drug quantity when there are no physical drugs.  The Sixth Circuit's directive in *United States v. Walton*, 908 F.2d 1289 (6th Cir. 1990) is worth considering.

> ". . . when choosing between a number of plausible estimates . . . a court <u>must</u> err on the side of caution."

> *Walton, supra* at 1302 (emphasis supplied).

A former Board member interviewed by the FBI spoke of the district's historical need to update old and degraded facilities impeded by the history of disallowance of necessary budgets.  The bottom line as indicated by a retired city councilwoman, Margene Scott, was that ER did excellent work.  This offense does not implicate the gravamen of jurisdictional concern in 18 USC § 666, misuse of federal funds.[5]

---

[5] Admittedly, corrupt payments need not be traced directly to federal funds.  *United States v. Valentine*, 63 F.3d 459 (6th Cir. 1995).  However, the purpose of the statute is to protect federal funds.  *Id*. At 465.  But *see, United States v. Foley*, 73 F.3d 484 (2nd Cir. 1996).  It therefore has been suggested that legislative history makes it "unlikely that Congress intended for Section 666 to reach state corruption that had no effect on federal funds simply because the states received money from the federal government."  18 USC § 666:  IS IT A BLANK CHECK TO FEDERAL AUTHORITIES PROSECUTING STATE AND LOCAL CORRUPTION? *Alabama Law Review* Vol. 52: 4:1317 at 1327.

Any conflict of interest on Morrison's part should not exclude moneys paid for job referrals and assistance with sub-contractors.  Referrals, especially for City Hall[6] or Clawson Schools[7] reduce the bribe amount.  *See* PSI p.8, para. 21.  And so do other referrals and assistance with acquiring subcontractors.  The government's own discovery included evidence that Morrison was listed as a witness in connection with a lawsuit relating to a private job referral.  Supplemental Witness List, Exhibit 36.  ER also had a varying need for different types of licensed subcontractors.  Albert Morrison helped find and referred subcontractors.  The two who invoiced ER the most money between 2014-2021 had totals of $164,144 and $288,809.50 for a total of $432,078.50.[8]  The Specific Offense Characteristics (Para. 26, p. 9) should, as suggested in Objections to Probation, be no greater than 12 (less than $550,000).

In Government Responses to Defense Objections the government wrote about the interview of former Clawson Schools Superintendent, Monique Beels.

> "Beels stated that during her term as Superintendent from July 2012 through June 2018 <u>she hired</u> John David's company to do the work in the district."   (Emphasis supplied.)

---

[6] Invoice, City of Madison Heights, City Hall (Exhibit 34).

[7] See attached summary (Exhibit 35).

[8] What they invoiced ER is some measurement of their value.  The investigators seem to think that Mr. David and ER had a fixed standing army of employees with licenses to work in the various trades.  Subcontractors are independent with their own schedules or desires of when and where to work.  What made ER unique was the ability to respond quickly (as in Clawson).  Anyone who knew, could and did contact reliable and promptly responsive subcontractors provides a valuable service.

The entire report of her interview however makes it clear that ER's first job at the time of flooding in August 2014 came as a result of the head of the maintenance crews.  Beels gave the name Ben Pasco, but this is believed to be the wrong name.  According to Beels, the head of the maintenance crews "was the person who contacted ER to come to Clawson."  Thus, not recognizing the name of Albert Morrison is of no significant moment.  The government also may suggest that projects outside the Madison school district are insignificant as it did in their Responses.  Defendant suggests otherwise.  Any payment for work beyond the district should not be included for bribe amount.  ER did good work and were given other jobs because of their "excellent work."

In John David's mind the string of successive work beginning with Clawson and spreading to other districts was like falling dominoes.  In his mind, it was the earned product and attributable to the Clawson work and therefore all a result of efforts by Morrison.   This included other school districts including Ferndale (7/19/2017 to 9/21/2021); Hazel Park (1/15/2019 to 8/19/2019; and St. Clair Shores (7/14/2015 to 5/28/2016).

In his dissent in *United States v. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014) Judge Merrit observes that "[s]ubjective intent is the keystone of bribery."  This thought should apply to the payor as well the public official.  Here, John David admits to turning a willful blind eye to the aspect of Morrison's influence in securing

9

more Madison school work after he already did the substantial Edison School job in early 2014.  This case, however, is neither as crass nor clearcut as most.[9]  And given the results of the neurocognitive tests and psychological report it is easy to see how all this became conflated in John David's mind.

Moreover, the unique set of facts and relationship here also makes the enhancement of 2 levels under USSG § 2C1.1(b)(i) inappropriate.  *Cf. United States v. Ford*, 344 F. Appx. 167 (6th Cir. 2009).  The payments made were installments not tied to specific jobs but rather a continuing relationship of influence.

## ANOTHER GUIDELINE CONSIDERATION

John David has no criminal history points (Para. 62, p. 15).  Importantly, this Court may consider pending Guideline amendments in connection with a variance.  *See e.g., United States v. McMillan*, 863 F.3d 1053 (6th Cir. 2017).  Significantly, a highly relevant principle is on the cusp of being codified November 1, 2023 in a provision entitled "Adjustment for Certain Zero Point Offenders."  § 4C1.1.  John David meets the requirement.  The offense has none of the ten disqualifying criteria. § 4C1(a)(1)-(10).  Thus, counsel suggests a reduction of offense level by 2 levels should be considered and applied.

Separately, there is the rigidity of the Guideline Section 2B1.1 Table:

---

[9] In paragraph 87 Probation notes the average length of imprisonment for similar cases involving defendants with similar records was 30 months.

The economic crimes Guideline, Section 2B1.1 of the
United States Sentencing Manual, routinely recommends
arbitrary, disproportionate, and often draconian sentences
to first-time offenders of economic crimes. 1 These
disproportionate sentences are driven primarily by Section
2B1.1's current loss table, which has an outsized role in
determining the length of an economic crime offender's
sentence. Moreover, this deep flaw in the Guideline's
design has led many judges to lose confidence entirely in
the Guideline's recommended sentences, leading to a wide
disparity of sentences issued to similarly situated
economic crime offenders across the country. 2
Accordingly, this Guideline has failed to address the
primary problem it was designed to solve—unwarranted
disparities among similarly situated offenders. Worse still,
it not only has failed to prevent such unwarranted
disparities, its underlying design actively exacerbates
them.

*How* the *Economic Loss Guideline Lost its Way, and How to Save It, Ohio State*

*Journal of Criminal Law*, Vol: 18.2:605 (2021) at 605-606.  *See also*, *The Federal*

*Sentencing Guidelines! A Good Idea Badly Implemented, Hofstra Law Review*, Vol:

46:805 (2018).

The Guidelines suggested by the government and accepted by Probation are

calculated too high.[10]  This Court is required to independently calculate and consider

them.   The final guideline calculation is then merely a starting point for

determination of the sentence to be imposed.  Beyond dispute is that a calculated

---

[10] The initial report prepared 7/10/23 had guidelines of 57-71 months.  A phone call
from the government pointing out the oversight changed them to 87-108 months.
Probation's position on the Objections incorporated by reference herein is unknown
at the time of writing.

range is not automatically an appropriate sentence.  *Wilson v. United States*, 555 U.S. 350 (2009).  *See also, Rita v. United States*, 551 U.S. 338 (2007).  Here, there are also ample, sound reasons for a variance.

Separate from this Memorandum Defendant is submitting a sealed Motion for Variance, which is incorporated by reference.  That motion includes extensive medical records as well as a comprehensive psychological report including assessment of cognitive and intellectual functioning and significant diagnoses.  The combination of all these physical and mental conditions militates strongly in favor of a substantial variance.

In 2009 John David and a crew from ER traveled to Monroe to the IHM convent to clean and restore the headstones.  John David did this after someone at St. Hugo asked him to assist an Eagle Scout in this service project.  Although Exhibit 37 (photos) could have been placed under an earlier section regarding charity and service it is here for the photo, Exhibit 37, p. 4 of Mr. David.  That photo is a stark reminder of how much his body has deteriorated in the recent past.  And it will only continue to do so.

Respectfully, a prison sentence is not necessary to satisfy the statute.  If the Court feels incarceration is needed, Defendant would submit only a modest period of incarceration in combination with home arrest would be sufficient to satisfy the statute.

Respectfully submitted,

*s/ Robert M. Morgan*
Robert M. Morgan (P23144)
14290 Northline Rd.
Southgate, MI 48195
313-320-3082
Attorney for Defendant
Dated:  August 3, 2023                    morgancrdefense@ameritech.net

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2023, I electronically filed the foregoing paper using the Court's ECF system, which will send notification of such filing to all counsel of record.

s/ Robert M. Morgan
Robert M. Morgan (P23144)
Attorney for Defendant