UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　Plaintiff,<br><br>v.<br><br>JOHN DAVID,<br><br>　　Defendant. | Case No. 22-20184<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING DEFENDANT'S NEW EMERGENCY MOTION UNDER NEW CIRCUMSTANCES FOR COMPASSIONATE RELEASE [100] AND REQUESTS FOR HEARING [101, 108]**

Business owner John David conspired with a public school board president to commit federal program bribery. Due in large measure to his serious health issues, David was sentenced to 24 months in prison, well below his guidelines range. After serving approximately five months, David moved for compassionate release based on the same health issues the Court considered in imposing the below guidelines sentence. That motion was denied. Two months later, David filed this "new" motion for compassionate release based on additional health issues. (ECF No. 100.) But once again, even if David could demonstrate extraordinary and compelling reasons for compassionate release, the § 3553(a) sentencing factors do not warrant his immediate release. Thus, the motion is DENIED.

I.

John David suffers from facioscapulohumeral muscular dystrophy. He also has chronic obstructive pulmonary disease (COPD), osteoarthritis in his left shoulder,

and other chronic conditions. This did not prevent him, however, from running a successful company that provided emergency restoration, repair, and reconstruction services. Nor did it prevent him from conspiring with Albert Morrison, the former school board president of the Madison Public School District, to divert federal funds from the school district to his company. Over the course of four years, David paid Morrison hundreds of thousands of dollars in return for receiving construction and restoration projects from the Madison school district, outside the competitive bidding process. These projects netted David's company millions of dollars.

To his credit, David pled guilty to bribery charges, accepted responsibility for his conduct, and has satisfied his $750,000 forfeiture money judgment. (ECF Nos. 29, 83.) After evaluating the relevant factors in 18 U.S.C. § 3553(a) and giving substantial consideration to David's muscular dystrophy and his many other serious health issues, the Court sentenced David to 24 months in prison—well under his guidelines range of 87–97 months. (ECF No. 51.) The judgment included a recommendation to Federal Medical Center Butner. (*Id.*) The Bureau of Prisons honored that recommendation and, following some extensions of his report date, David began serving his custodial sentence at Butner on or around January 9, 2024. (ECF No. 81.)

A little more than a month later, David wrote to the warden seeking compassionate release. (ECF No. 86, PageID.1197.) He proclaimed that he could not get the care he required while incarcerated in Butner. (*Id.*) Unfortunately, David had suffered a serious fall in his cell the first week of February and was upset with how

2

the prison handled it. (*Id.*) He further told the warden that activities of daily living were impossible due to his debilitating muscular dystrophy. (*Id.* at PageID.1202.)

A few weeks later, the warden wrote to the BOP's general counsel office to recommend that "consideration be given to a request for reduction in sentence" for David. (*Id.* at PageID.1204.) The request, however, appears to have been precipitated by the warden's mistaken belief that David's muscular dystrophy diagnosis was "unavailable at the time of sentencing." (*Id.*)

Still, the BOP reviewed the warden's request. And it concluded, following an evaluation of David's medical records by Dr. Elizabeth Stahl, that at that time David did not meet the criteria for a reduction in sentence. (*Id.* at PageID.1205–1206.) Dr. Stahl thoroughly explained:

> Mr. David is a 66-year-old male with a medical history of muscular dystrophy, chronic obstructive pulmonary disease (COPD), depression, stage II pressure ulcer of the buttock, neurogenic bladder and left shoulder osteoarthritis. Mr. David is being followed by endocrinology and urology, and has pending consults with Occupational Therapy (OT) and orthopedic services due to exacerbation of his chronic left shoulder pain. In the past month, Mr. David has had an increase in falls and was transferred to the medical unit for additional supports and supervision. Mr. Davi[d] utilizes a wheelchair for mobility from which he can transfer in and out of and self-propel short distances, and is able to ambulate slowly around the unit with the wheelchair as an aid and/or a rolling walker. Mr. David remains generally independent with his Activities of Daily Living (ADLs) and Instrumental Activities of Daily Living (IADLs). He is independent with feeding, dressing using adaptive equipment, bathing, using the phone, computer and TRULINGs, managing his commissary list and items, preparing meals/snacks outside of food service, traveling independently in the community and managing his medications. Mr. David was last seen by Physical Therapy (PT) on February 8, 2024. It was noted during this visit that Mr. David has difficulty raising his arms, so he does not comb his hair or shave. Given Mr. David's neurogenic bladder, PT noted that he is incontinent

3

> and is independent with self-catheterization. Mr. David is alert, fully oriented and able to make his needs known.
>
> Based on our review of the medical record, Mr. David does not meet the debilitated [Reduction in Sentence] criteria at this time given that he remains generally independent with his ADL and IADL needs. Although he utilizes a wheelchair for mobility he remains independent with transfers and is able to ambulate short distances with the support of a rolling walker. Mr. David's life expectancy is indeterminate and does not meet the terminal RIS criteria based on a life expectancy that is 18 months or less. Lastly, he does not meet the elderly with medical condition RIS criteria, as he has not served 50% of his sentence. At such time as there is evidence of further disease progression and physical debilitation, a RIS request may be resubmitted for consideration.

(*Id.*)

David disagreed with the BOP's assessment and, with the assistance of counsel, filed a motion for compassionate release under 18 U.S.C. § 3582. (ECF No. 86.) "Simply stated," argued David, "[he] requires specialized medical care that is not adequately available in the prison environment. His release would enable him to receive comprehensive care tailored to his complex medical needs." (*Id.* at PageID.1192.) The government opposed the request (ECF No. 90) and the Court ultimately denied the motion (ECF No. 92). After reviewing David's prison medical records, the Court found that, on one hand, they confirmed David's position that his medical needs are great, but on the other hand, they confirmed the government's position that the BOP was working to manage these health issues and that nothing suggested David was being denied or delayed any care upon request. (*Id.* at PageID.1719.) The Court also found that an evaluation of the relevant sentencing factors under 18 U.S.C. § 3553(a) did not support a reduction in David's sentence. (*Id.* at PageID.1719–1720.)

Initially, David sought to appeal this ruling. (ECF No. 93.) But he subsequently withdrew the appeal (ECF No. 98) to file another motion for compassionate release (ECF No. 100)—still having served only about nine months of his sentence. This renewed motion, says David, is based on "entirely new circumstances." (*Id.* at PageID.1790.) The government continues to oppose David's request for immediate release from prison. (ECF No. 105.) It has provided David's relevant medical records detailing his care at Butner from June 2024 through September 23, 2024. (ECF No. 105-2 (sealed).) Having reviewed the briefing, and even recognizing that David is now proceeding *pro se*, the Court does not believe that additional argument is needed. *See* E.D. Mich. LR 7.1(f). Thus, David's motions for a video conference hearing (ECF Nos. 101, 108) are DENIED. *See* Fed. R. Crim. Pro. 43(b)(4) (providing that a defendant's presence is not required in a proceeding for reduction of sentence under 18 U.S.C. § 3582(c)).

## II.

A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). One exception to this rule is compassionate release. The compassionate release statute allows the Court to reduce a defendant's sentence if it finds, after a defendant has exhausted his administrative remedies or 30 days after the warden receives a request for compassionate release, that "extraordinary and compelling reasons" warrant a reduction; that a reduction is "consistent with applicable policy statements issued by the Sentencing Commission"; and that the sentencing factors under 18 U.S.C. § 3553(a), to the extent they apply,

5

support a reduction. 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission has recently amended its policy statement in U.S.S.G. § 1B1.13 to cover compassionate release motions filed directly by defendants (as well as those brought by the Director of the Bureau of Prisons). It remains the case, though, that without an "extraordinary and compelling" reason, the district court may not grant compassionate release. *See United States v. Hunter*, 12 F.4th 555, 572 (6th Cir. 2021).

## A.

The First Step Act's exhaustion requirement is mandatory. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). It is not clear whether David has complied. David contends, without any supporting documentation or affidavit, that he submitted a request for release to the warden. (ECF No. 100, PageID.1788.) The government contends, without any supporting documentation or affidavit, that, "[a]ccording to the Bureau of Prisons, David has not submitted a request for release with the warden based upon the medical conditions raised in the instant motion." (ECF No. 105, PageID.1827.)

This is not a trivial matter. The warden is aware of David's medical issues and engaged with David's prior request for compassionate release. This resulted in an evaluation of David's medical conditions by a medical professional that was useful in deciding David's initial motion. Unfortunately, an updated evaluation has not been provided.

Since the parties have fully briefed the issues, however, the Court will give David the benefit of the doubt that he satisfied the exhaustion requirement.

B.

The next hurdle is whether David has an extraordinary and compelling reason to reduce his sentence. It is his burden to carry. *See United States v. Crespin*, No. 23-2111, 2024 U.S. App. LEXIS 15071, at *12 (10th Cir. June 21, 2024) ("[T]he weight of authority indicates that the defendant carries the burden on a motion for compassionate release to show he is entitled to relief."); *United States v. Avalos Banderas*, 39 F.4th 1059, 1062 (8th Cir. 2022) (placing the burden to show entitlement to compassionate release under § 3582(c)(1) on the defendant); *United States v. Onamuti*, No. 22-2984, 2023 U.S. App. LEXIS 7844, at *3 (7th Cir. Mar. 28, 2023) ("[I]f the defendant does not meet his burden of establishing 'extraordinary and compelling circumstances' for release, the judge may deny the motion regardless of any government response.").

Under certain provisions of the Sentencing Commission's amended policy statement, as relied on by David, extraordinary and compelling reasons may exist based on a defendant's age and serious medical conditions. U.S.S.G. § 1B1.13(b).

1.

First, "extraordinary and compelling reasons exist" where "[t]he defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13(b)(2). David cites this provision in passing. (ECF No. 100, PageID.1789.) But it does not currently apply. David is 66 years old and his muscular dystrophy causes

7

a progressive deterioration in his health. But his projected release date is June 23, 2025. *Find an Inmate*, Fed. Bureau of Prisons, https://perma.cc/5WYN-35EM. Thus, he has not served 75 percent of his two-year term of imprisonment. So § 1B1.13(b)(2) does not apply.

**2.**

Second, the Court can find extraordinary and compelling circumstances where "the defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13(b)(1)(B). David provides nothing to counter Dr. Stahl's earlier conclusion that David "remains generally independent with his ADL and IADL needs." (ECF No. 86, PageID.1206.) And that conclusion is supported by more recent prison medical records supplied by the government. As noted in the "exam comments" from David's August 12, 2024, visit to health services:

> Patient is pleasant and cooperative. Presents ambulating w/ moderately/severe antalgic gait. He uses a rollator walker for assistance. Transfers independently. Dons/doffs shirts independently, w/ some difficulty noted; favors the left side/shoulder.

(*See* ECF No. 107, PageID.1868–1869 (sealed); *see also id.* at PageID.1894 (exam comments from July 16, 2024, visit to health care services, noting that David was "[r]eceived in his wheelchair propelling himself using his feet. He ambulates walking behind his wheelchair or holding onto furniture. Transfers independently").) Thus, David is not entitled to relief under § 1B1.13(b)(1)(B).

8

**3.**

That leaves § 1B1.13(b)(1)(C), which is the focus of David's motion. This portion of the amended policy statement provides that extraordinary and compelling reasons exist where "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C). Given this language, the Sentencing Commission must have contemplated that courts would evaluate certain claims of inadequate medical care in resolving compassionate release motions. Thus, while the government is not wrong to point out that such claims are typically raised in habeas corpus petitions or civil rights actions under 42 U.S.C. § 1983 (or, when dealing with BOP facilities, *Bivens* actions) (ECF No. 105, PageID.1828), the Court will exercise its discretion to address them here.

David claims that he is receiving inadequate care at the Butner medical facility in several respects. He suggests this is consistent with public news reports about Butner's history of problematic care. (ECF No. 100, PageID.1791.) As the Court previously found, however, there is nothing about David's medical records that suggest he is being denied proper care and treatment (ECF No. 92)—he is examined as needed, referred to specialists, prescribed medications, given direction on follow-up care, and prescribed medical devices as needed, including a walker, reacher, leg compression garments, nebulizer, and mattress pressure reducer (ECF No. 107 (sealed), PageID.1933). While David is not receiving his preferred medications and

9

treatments, that is hardly out of the ordinary in a prison setting. Nor is it a compelling reason for immediate release.

David's primary complaint is that he is being denied shoulder replacement surgery and adequate medication to deal with the chronic pain in his left shoulder. (ECF No. 100, PageID.1790, 1793.) It is true that David's care providers at Butner do not view surgery as his best option. During David's July 17, 2024, clinic encounter for shoulder pain, the treatment provider noted, "Inmate has Stage IV COPD and is probably not a candidate for shoulder replacement and needs to continue with conservative pain [management] options, given his chronic hypoxic respiratory failure. He will be a very high risk surgical candidate and will not get pulmonary clearance."[1] (ECF No. 107, PageID.1890.) But in lieu of surgical intervention, David's medical records reveal numerous health clinic visits, treatments, and medications to try to manage his shoulder pain. For example, the facility has been providing steroid injections, Meloxicam, and Oxycodone 5mg, three times per day, to address David's pain. On August 12, 2024, David was given a shoulder injection using ultrasound guidance, because that injection technique had been more effective for him in the past. (*Id.* at PageID.1868.) David, though, is still in pain and would like to have his Oxycodone dose increased to 10 mg. It appears that issue has been referred to the Pain Management Clinic. (*Id.* at PageID.1875.)

---

[1] It was further noted that David is "due for release in one year." (ECF No. 107, PageID.1890.) In fact, considering his good time and programming credits, his home detention eligibility date is April 27, 2025. (ECF No. 106, PageID.1840 (sealed).)

10

Given that David's providers have determined he is not a surgical candidate and given that David will be able to seek the opinions of different providers upon his release in a just few months, the Court cannot say that Butner's use of nonsurgical means to alleviate David's pain is an extraordinary and compelling reason to release him now.[2]

David also complains that Butner's physical therapy department, which provides him with regular recreational therapy exercise sessions (*id.* at PageID.1945–1946), "does not have adequate equipment to aide him in improving his activities of daily living" (ECF No. 100, PageID.1792, 1793). Why or how this is the case is unspecified. David does not describe the equipment he has access to vis-a-vis the equipment he is lacking, or the necessary exercises he is prevented from undertaking. Thus, without more information, there is no basis to find that this is an extraordinary and compelling reason for his immediate release.

Next, David says he is not being given Trelegy to treat his COPD, and no other medications work. (*Id.* at PageID.1793, 1794.) The only medical record that references David's desire for Trelegy is from his health clinic visit on July 1, 2024. (ECF No. 107, PageID.1900.) The same record also indicates that "about a month ago" David was "transitioned to triple therapy Breztri" (another COPD inhaler)[3] (*id.*) and that

---

[2] This is obviously not a new condition. It is unclear why David did not have surgery earlier or whether one was even planned prior to his incarceration.

[3] "BREZTRI combines 3 medicines, an inhaled corticosteroid (ICS) medicine (budesonide), an anticholinergic medicine (glycopyrrolate), and a long-acting beta2-adrenergic agonist (LABA) medicine (formoterol fumarate) in one inhaler." BREZTRI Aerosphere, https://perma.cc/BE9R-2H6Z.

11

David's treatment provider was going to "place [a] NFR [non-formulary request] for trel[e]gy" and "[i]f trelegy is approved, will [discontinue] Breztri" (*Id.* atPageID.1901). In addition to either Trelegy or Bretzri, David is given oxygen to help with his breathing. (*Id.* at PageID.1900.) This is hardly a lack of treatment for his COPD.

Further, David is understandably concerned that his prostate-specific antigen ("PSA") level has risen from .5 to .7. (ECF No. 100, PageID.1794.) While David says his requests for further testing have been ignored (*id.*), this is not accurate. On June 21, 2024, David was seen by urology services after his elevated PSA level was noted. The doctor recommended repeating David's PSA test and he was scheduled for a three-month follow up with urology. (ECF No. 107, PageID.1886.) If that has not already occurred, it should take place soon. David is also being monitored by an endocrinologist. (*Id.* at PageID.1999–2006.)

Likewise, the Court questions the veracity of David's claim that he was refused a colonoscopy after he told the medical providers that he saw blood in his feces. (ECF No. 100, PageID.1794.) According to David's medical records, he had a colonoscopy on September 3, 2024, and recovered well. (ECF No. 107, PageID.1852.) Two days later he had a post-procedure follow-up. (*Id.* at PageID.1848.) At that time, David "[r]eported some dark red blood in stool, post colonoscopy which showed diverticulosis, but no colon polyps per patient." (*Id.*) A few days after that, David had a whole-body PET scan. (*Id.* at PageID.1844.)

Lastly, David says his underlying health conditions make him exceptionally vulnerable to severe illness or death should he get COVID-19. (ECF No. 100,

12

PageID.1785, 1790.) He acknowledges, however, that currently, there are only two confirmed cases of COVID-19 at Butner. (*Id.* at PageID.1796; ECF No. 105, PageID.1832.) And even accepting the serious nature of David's medical conditions, his argument is foreclosed by the Sixth Circuit's ruling that "a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling' reason warranting a sentence reduction." *United States v. Traylor*, 16 F.4th 485, 487 (6th Cir. 2021) (quoting *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021)). David's motion makes clear that he has access to the vaccine at Butner, even though he has chosen not to be vaccinated. The Sixth Circuit has also rejected David's challenge to the efficacy of the vaccines. *See, e.g.*, *United States v. Hayes*, No. 23-1589, 2024 U.S. App. LEXIS 15426, at *5 (6th Cir. June 25, 2024) ("Hayes challenged the significance of his vaccination, arguing that it does not guarantee immunity against COVID-19 and its variants. But no one is guaranteed immunity; the important point is that vaccines substantially reduce 'the risks associated with COVID-19.'") (citing *Lemons*, 15 F.4th at 751 ("[W]ith access to the [COVID-19] vaccine, an inmate largely faces the same risk from COVID-19 as those who are not incarcerated.")); *United States v. Kennedy*, No. 21-2675, 2022 U.S. App. LEXIS 528, at *7 (6th Cir. Jan. 5, 2022) ("[I]f an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction . . . on the grounds that COVID-19 constitutes an extraordinary and compelling justification." (citation omitted)). In

13

short, David's concerns about what might happen should he get COVID again do not warrant his immediate release.

David is serving a prison sentence following a bribery conviction. It is not surprising that he is not receiving the same treatment he says he could receive at home. Nor is it extraordinary or compelling, especially where his claims of deficient care are not borne out by his medical records. *See United States v. Smith*, No. 23-5519, 2024 U.S. App. LEXIS 5719, at *13 (6th Cir. Mar. 24, 2024) (noting that defendant's "desire to see his own doctors, on his own terms, is not an extraordinary and compelling reason warranting his release"). At this time, given the current record, the Court cannot find that the BOP is unable to manage David's challenging health conditions.

## C.

After serving about ten months of his sentence, David is also not entitled to immediate release because the § 3553(a) sentencing factors do not support such a reduction in his sentence.

David's new motion for compassionate release provides no basis for the Court to alter its prior ruling. (ECF No. 92, PageID.1719–1720.) The Court noted that many facts weighed in David's favor. His underlying offense is his only criminal conduct in an otherwise law-abiding, successful life. His failing health also makes repeat conduct unlikely and prevents him from posing any danger to the community. And he has strong family and community support.

But the Court also found that this did not diminish the seriousness of his offense. As the Court further explained:

> David and his co-defendant corrupted a process for awarding construction and repair contracts in a public school district, causing long-term, negative consequences to the district. It was an offense of pure greed. It involved repeated acts over a four-year period. Public officials and private sector employees who do business together need to know there are significant consequences for violating the public trust when they act corruptly.
>
> Thus, a sentence of a few months would not reflect the seriousness of the offense, provide adequate general deterrence or punishment, or avoid unwarranted sentencing disparities—especially where David's already reduced sentence accounted for many of the facts weighing in his favor, particularly his serious health conditions.
>
> Thus, these factors do not warrant an additional reduction in David's sentence.

(*Id.*)

In response, David simply indicates that, while his offense was serious, it does not outweigh his need for adequate medical care. (ECF No. 100, PageID.1795.) This is not a meaningful analysis of the § 3553(a) factors. Nor does the Court balance the § 3553(a) factors against the claimed extraordinary and compelling reasons for release. These are separate and independent elements that both need to be satisfied. *See United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021) ("[D]istrict courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others."); *United States v. Sandlain*, No. 22-2049, 2023 U.S. App. LEXIS 11107, at *3 (6th Cir. May 4, 2023) ("The [compassionate release] statute required [defendant] to show both that 'extraordinary and compelling reasons' justified his immediate release and that the

15

release comported with the sentencing factors in 18 U.S.C. § 3553(a)."). And here, they are not.

### III.

For these reasons, David's new emergency motion for compassionate release is DENIED.

IT IS SO ORDERED.

Dated: October 16, 2024

                                                <u>s/Laurie J. Michelson</u>
                                                LAURIE J. MICHELSON
                                                UNITED STATES DISTRICT JUDGE